IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

KENNETH TRACEY WHITE,

                    Plaintiff

        VS.

CURTIS JOHNSON, *et al.*,

                    Defendants

NO. 5:03-CV-234 (DF)

PROCEEDINGS UNDER 42 U.S.C. § 1983
BEFORE THE U. S. MAGISTRATE JUDGE

# RECOMMENDATION

Plaintiff KENNETH TRACEY WHITE is an inmate in the custody of the State of Georgia.  He has sued defendants CURTIS JOHNSON, LT. STEVEN ROGER HELMS, ANGELINA MCRAE, SGT. JESSE ROGERS, and DIANE REED alleging that the defendants violated his constitutional rights while he was incarcerated at Wilcox State Prison in Abbeville, Georgia.    Plaintiff states that he has received constitutionally deficient medical care for his serious medical needs. Plaintiff alleges that he was not properly and timely treated for Pott's Disease which is a form of tuberculosis.

Before the court is the defendants' **MOTION FOR SUMMARY JUDGMENT**.  Tab #120. The motion is supported by a brief, affidavits, and medical records. The court advised the plaintiff of said motion and his duty to respond properly thereto. Tab #121.  The plaintiff has filed a response to the defendants' motion. Tab #125. In entering this order, the undersigned has carefully considered the defendants' motion and all attachments thereto, as well as the plaintiff's responses.

LEGAL STANDARDS
A. Summary Judgment

Rule 56 of the *Federal Rules of Civil Procedure* dealing with motions for summary judgment provides as follows:

> The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Summary judgment can only be granted if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c); Warrior Tombigbee Transportation Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). While the evidence and all factual inferences therefrom must be viewed by the court in the light most favorable to the party opposing the motion, the party opposing the granting of the motion for summary judgment cannot rest on his pleadings to present an issue of fact but must make a response to the motion by filing affidavits, depositions, or otherwise in order to persuade the court that there are material facts present in the case which must be presented to a jury for resolution. *See Van T. Junkins & Assoc. v. U.S. Industries, Inc.*, 736 F.2d 656, 658 (11th Cir. 1984).

Specifically, the party seeking summary judgment bears the initial burden to demonstrate to the court the basis for its motion by identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show that there is an absence of any genuine issue of material fact. *Hairston v. The Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir.1998). In determining whether the moving party has met this burden, the court must review the evidence and all factual inferences drawn from this, in the light most favorable to the non-moving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

If the moving party successfully meets this burden, the burden then shifts to the non-moving party to establish by going beyond the pleadings, that there are genuine issues of material fact to be resolved by a fact-finder. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Genuine issues are those as to which the evidence is such that a reasonable jury could find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).[1]

---

[1]*See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (the purpose of summary judgment is to pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial); *Brown v. City of Clewiston*, 848 F.2d 1534, 1543 (11th Cir. 1988) (the question is whether the record as a whole could lead a rational trier of fact to find for the nonmovant).

## DISCUSSION
## 1. Deliberate Indifference

In *Estelle v. Gamble*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." 429 U.S. 97, 97 S. Ct. 285, 50 L.Ed.2d 251, rehearing denied 429 U.S. 1066, 97 S. Ct. 798, 50 L.Ed.2d 785 (1976). However, the course of treatment is "a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107.[2] A mere disagreement between a prisoner and prison officials as to diagnosis or treatment does not give rise to a constitutional violation. *Id*. at 106.

Delay in access to medical attention can violate the Eighth Amendment when it is tantamount to unnecessary and wanton infliction of pain. Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to lay persons because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem. In contrast, delay or even denial of medical treatment for superficial, nonserious physical conditions does not violate the Eighth Amendment. The seriousness of an inmate's medical needs may be decided by reference to the effect of the delay in treatment.

---

[2]At most, a mere allegation of improper or untimely treatment, without more, states a claim of medical malpractice cognizable under state law. *Id. See also Howell v. Evans*, 922 F.2d 712, 719 (11th Cir. 1991) (vacated pursuant to settlement, 931 F.2d 711 (11th Cir. 1991), reinstated by unpublished order (June 24, 1991), cited in *Howell v. Burden*, 12 F.3d 190, 191 n.* (11th Cir. 1994)). Moreover, *Estelle* specifically states that the question of whether an x-ray or additional diagnostic techniques or forms of treatment are indicated are classic examples of matters for medical judgment and that medical malpractice does not become a constitutional violation merely because the patient is a prisoner. 97 S.Ct. at 292-93.

Where the delay results in an inmate's suffering a life-long handicap or permanent loss, the medical need is considered serious. An inmate who complains that delay in medical treatment rose to a constitutional violation must place <u>verifying</u> <u>medical</u> <u>evidence</u> <u>in</u> <u>the</u> <u>record</u> to establish the detrimental effect of delay in medical treatment to succeed. Further, the tolerable length of the delay in providing medical attention depends on the nature of the medical need and the reason for the delay. Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay. *Hill v. Dekalb R.Y.D.C.*, 40 F.3d 1176, (11th Cir.1994) (emphasis added).

In support of their motion for summary judgment, the defendants have submitted the plaintiff's medical records and the affidavit of Dr. Kenneth Benjamin. The medical records and affidavit indicate that the defendants were not deliberately indifferent to plaintiff's serious medical needs.

Shortly after plaintiff began his incarceration, it was noted that he had fallen off a light post in 1998 and had been severely electrocuted; this required an extended hospital stay. It was also noted that he had had a positive test for tuberculosis and took medicine for it for two months in 1990. On January 27, 2000, plaintiff stated that he was not having any symptoms of tuberculosis, but that he was experiencing stomach and back pain. A chest x-ray was ordered which was within normal limits. Plaintiff was given various medical profiles to help him with his pain. *See* Tab #117, medical records at 1-4.

On February 11, 2000, an x-ray was taken of plaintiff's cervical spine. It showed a straightening of the normal curvature. Degenerative changes were also noted at C4-C5 and C5-C6. However, intervertebral spacing was intact. Posterior osteophytes were noted at C5-C6 with minimal encroachment on the spinal formina. *Id*. at 5.

In April and May of 2000, plaintiff was given medication for his pain. He was prescribed the muscle relaxer Robaxin and Naprosyn for inflammation, but only accepted six of the fifty doses of Robaxin and seven of thirty-eight doses of Naprosyn. *Id*. at 6-7.

On August 6, 2000, plaintiff's chart was reviewed.  It was determined that there was no medical reason for him to have a soft shoe and no wellness walk profiles because numerous tests had showed that he had only a minimal disc disorder.  This angered plaintiff, so he stormed out fo the doctor's office requesting that all of his other profiles be discontinued as well.  Over plaintiff's objections, all of his other profiled were renewed.  *Id.* at 8-9.  Over the rest of the year, plaintiff was continually given medication for his pain and various medical complaints.  *Id.* at 11, 13, 14, 16, 17, and 18.

Plaintiff was seen in medical on February 1, 2001, for complaints of neck, back and shoulder pain.  It was noted that his weight was 169.  Following an examination, he was prescribed Percogesic and his Robaxin was refilled.  *Id.* at 15.

By May 2001, plaintiff's complaints of back pain were increasing and he was seen in medical on various occasions.  However, his weight was noted to be stable and he had a below-normal temperature.  Plaintiff's existing profiles were renewed and he was given a soft shoe profile and profiles for no sports and wellness walk.  *Id.* at 15-20.

On May 23, 2001, plaintiff was seen in medical for complaints of back pain.  At that time, he could not complete range of motion exercises.  An x-ray of his lumbar and thoracic spine were ordered.  The x-ray showed a basically normal spine with disc space preserved and no destructive lesions.  He was educated as to degenerative joint disease.  *Id.* at 21-22.

Plaintiff was seen in the chronic care clinic in June for continued complaints of back pain.  He had a below normal temperature at each visit and his weight was stable.  It was noted that his x-rays were normal and physical examination showed his reflexes to be normal.  No neurological defects were noted.  Plaintiff was taken off Elavil and placed on Baclofen.  He was also educated to do back exercises.  His profiles were renewed in July.  *Id.* at 23-26.

On July 5, 2001, a consultation request was submitted for EMG studies of plaintiff's bilateral extremities in order to discover the source of his pain. The request was denied because there was no medical reason that such steps be taken.  *Id.* at 27.

On July 12, 2001, plaintiff refused to be treated at medical because he felt "nothing could be accomplished." *Id*. at 28.

On July 18, 2001, the consultation request for EMG studies was resubmitted because plaintiff was diagnosed with having radiolopathy. The request was approved on July 23, 2001. *Id*. at 29.

Plaintiff was seen in medical on July 21, 2001. He stated that he had a "catch" in his back, difficulty standing up, and pain radiating down his left leg. He was prescribed Phenegren and Tylenol #3 and was housed in the infirmary for the night for observation. It was noted that EMG tests were pending. *Id*. at 30.

Plaintiff was diagnosed as having low back pain and placed on bed rest. Plaintiff remained in the infirmary until July 30, 2001. He was placed on several medications for his pain including Tylenol, Darvocet, and Ibuprofen. While in the infirmary, it was noted that plaintiff had a history cocaine and alcohol abuse. After plaintiff was released from the infirmary, his Baclofen, Ibuprofen, and Percogesic were continued. *Id*. at 31.

On August 3, 2001, plaintiff refused to be seen at sick call. It was noted that plaintiff did not appear to be in any distress when he left and that he had a below average temperature. His chart was review for excessive medical visits. *Id*. at 32-33.

Plaintiff did not go to medical for his August 7, 2001, appointment. *Id*. at 34.

Plaintiff was next seen at medical on August 10, 2001, for complaints that he was unable to lift his arms over his head. He was not in any distress, and had no edema, swelling, or tenderness to the touch. Plaintiff was advised to take his medications as prescribed. It was also noted that he dropped his cane on the floor on the way out and had no difficulty bending over to pick it up. *Id*. at 35.

On August 27, 2001, plaintiff had his EMG Consultation with the Department of Neurology at the Medical College of Georgia. However, the results were not available for approximately a month. *Id*. at 43-44.

Plaintiff had his TB skin test updated on August 29, 2001. It was noted that he would not be seen again until April 9, 2001, because he had no signs or symptoms of TB. *Id*. at 36.

6

On September 10, 2001, plaintiff was again examined because his back was tender to the touch.  No deformity was noted.  His temperature was low and his weight was stable.  He was referred to the physician.  *Id*. at 37.

Plaintiff pending EMG results were noted at his September 21, 2001, medical appointment. He was also evaluated for scoliosis as he stood with an asymmetrical stance.  Plaintiff's temperature was noted as being at 98 and he had gained some weight.  No changes were made to his existing profiles.  *Id*. at 38.

Plaintiff did not go to his medical appointment on September 25, 2001.  *Id*. at 39.

On September 26, 2001, plaintiff had a podiatry telemedicine appointment.  His vitals were noted to be normal and his weight was stable.  He voiced no complaints at the appointment.  *Id*. at 40.

Around 4 am on September 27, 2001, the dorm officer called medical because plaintiff was complaining of back pain.  Plaintiff was instructed to remain in his bed as he had a doctor's appointment later that day.  At noon, plaintiff was brought to medical because he stated that he could not walk.  Plaintiff was admitted to the infirmary where he was placed on bed rest and scheduled to see the doctor.  He was given Nubain for pain.   Plaintiff was seen by Dr. Sripathi at 3 pm. It was noted that plaintiff had ridden in a van for a consult the day before without any complaints.  His vitals were again found to be stable.  Dr. Sripathi prescribed bed rest in the infirmary and the continuation of the Percogesic and Baclofen.  *Id*. at 41-42.

Plaintiff's EMG results were reviewed by Dr. Sripathi on September 28, 2001.  The results showed normal nerve conduction studies and normal needle exams of the right lower extremitiy and cervical and lumbar paraspinals.   Plaintiff was then examined that same day by Dr. Sripathi to explain his EMG results.  Plaintiff reported to Dr. Sripathi that some days he had no back pain and that on others he could not move.  He also stated that he back was improving.  Plaintiff was diagnosed with alleged back pain. A neurology consult for further testing was placed. At this point, the medical staff began to question whether plaintiff was malingering or exhibiting drug seeking behavior. *Id*. at 43-45.

Through October 4, 2001, plaintiff was continually monitored and given medication at the infirmary.  Thereafter, he was transferred to the infirmary at Georgia State Prison because the infirmary at Wilcox State Prison can only house prisoners for 18 hours.  While he was still at Wilcox, plaintiff was not found to be in any acute distress and his temperature was normal.  At this point, Dr. Sripathi diagnosed plaintiff as having malignant back pain and submitted  consultation requests so more tests could be done.  Plaintiff was again examined by Dr. Sripathi on October 4, 2001.  He was unable to bear weight on his right leg, but otherwise had no complaints. *Id*. at 45-50.

After he was transferred to the infirmary at Georgia State Prison, he was examined.  It was noted that his temperature was slightly below normal.  Plaintiff was diagnosed as having exacerbated chronic back pain and was continually provided with pain medication throughout the month of October.  *Id*. at 50-56.

Plaintiff was next seen in the infirmary on October 16, 2001.  He voiced no complaints. Utilization Management was called regarding the status of plaintiff's pending neurological consultation.  *Id*. at 57.

Plaintiff's neurological consult was denied on November 2, 2001, due to a lack of radiological evidence and medical justification.  *Id*. at 59.

Following the denial of his neurological consult, plaintiff was transferred back to Wilcox. Upon his arrival, he was examined by Dr. Sripathi.   The next morning, plaintiff stated that his back had hurt all night and that he was unable to sleep.  Examination was normal and it was noted that "there is no reason why this inmate has severe pain limiting his walking, nor a reason for issuance of narcotics."  Thereafter, Dr. Sripathi placed another call to Utilization Management  and consulted with the director who stated that no further procedures would be approved for plaintiff as there was no medical reason for them.  *Id*. at 60-61.

Plaintiff was examined by Dr. Sripathi on November 9, 2001.  It was noted that he was able to take a few steps with help.  Dr. Sripathi then spoke with Dr. Paris, the Medical Director for the Georgia Department of Corrections, who agreed that plaintiff should have more neurological testing to determine if he was malingering.  Dr. Sripathi also noted that plaintiff's case was difficult to assess because "he may be lingering to some extent."  *Id*. at 62.

On November 11, 2001, plaintiff reported that he was having trouble breathing deeply. A CBC was ordered which showed his white blood cell, red blood cell, and platelet counts to be high. Plaintiff was again examined by Dr. Sripathi less than a week later. It was at this time that plaintiff notified him of his loss of appetite, weight loss, and night sweats. Dr. Sripathi also noted a cough, so TB was considered. An urgent consult was placed to rule out TB. Plaintiff was then transferred to Augusta State Medical Prison for testing and hemorrhoids surgery. *Id*. at 63-67.

A chest x-ray performed on November 19, 2001, revealed a normal chest with no acute cardiopulmonary disease. *Id*. at 68.

On November 19, 2001, plaintiff was interviewed due to the consultation request. His past TB test and his refusal to take INH were noted. Plaintiff told the physician that he had been experiencing night sweats and loss of appetite for two months but had only informed medical two weeks prior. *Id*. at 70-71.

After being transferred to Augusta State Medical Prison, plaintiff had three TB test come back as normal and his CXR was normal, so he was taken out of isolation and scheduled to be returned to Wilcox. It was noted that his back problems were most likely related to his 1998 electrocution. He was discharged from Augusta on December 3, 2001. *Id*. at 72-73.

Plaintiff was next seen for a follow-up for an unrelated medical condition on January 8, 2002. It was noted that TB was ruled out by Sputum testing. An urgent neurological consult was requested because it was decided that an MRI and neurological testing was needed. The request was approved. *Id*. at 74-75.

Plaintiff had an MRI of his lumbar spine on January 13, 2002. Results were abnormal with complete marrow replacement with large anterior and posterior epidural components. These results suggested an infectious etiology such as Pott's disease. An infectious disease and orthopaedic consult and biopsy were recommended. *Id*. at 76-77.

Plaintiff had a chest x-ray on January 15, 2002. Two views of his lumbar sacral spine were also taken. Results showed an increase density overlaying the heart. No cavity lesions or adenopathy were noted. The lumbar x-rays were compatible with the abnormal MRI. An urgent neurosurgery consultation for suspected cord compression and spinal tumor was requested and approved the next day. *Id*. at 78-81.

9

Plaintiff was re-admitted to Augusta on January 16, 2002.  It was noted that plaintiff's pain and touch thresholds could not be evaluated due to anxiety and complaints of pain to superficial touching.  It was also noted that it was suspected that plaintiff had a tumor, however all tests were negative.  *Id*. at 82-98, 100.

On January 28, 2002, plaintiff had another chest x-ray which showed a stable chest with no acute changes.  A x-ray of his spine four days later showed mild scoliosis and degenerative changes. A bone marrow biopsy was performed on February 4, 2002.  *Id*. at 101-103.

On February 8, 2002, an urgent consult for a second MRI of plaintiff's spine was requested. It was approved the same day.  Results showed a large tissue mass with significant epidural component encroaching and surrounding the cord.  A neurosurgical consult was requested.  It was also noted that the February 4, 2002, biopsy results were positive for TB.  Plaintiff was diagnosed with Pott's disease and place on INH, Rifampin, Ethambutol, Rifomate, and Pyrazinamide.  *Id*. at 104-110, 112.

On April 10, 2002, it was noted that plaintiff was tolerating his medications well.  He was also prescribed physical therapy and his sputum was tested monthly.  Plaintiff was given a profile for use of a wheelchair even though his physical therapist did not think he was meeting his potential and failed to show up for therapy sessions.  *Id*. at 112-118, 124.

A follow-up MRI was requested on August 22, 2002.  The request was approved on September 10, 2002.  Results showed no changes to the cervical spine since the February MRI. However, a new acute kyphosus was noted as were post-surgical changes so a neurosurgical or orthopaedic surgical consultation was recommended.  *Id*. at 119-121.

On September 10, 2002, it was noted that plaintiff's ANA screen was negative and his iron binding capacity were within normal range. *Id*. at 122-123.

Plaintiff was seen by a neurosurgeon on November 5, 2002, An MRI was requested and he was scheduled to return after that was completed.  Additionally, it was noted that plaintiff's treatment, testing, and therapy was continued through November 2002.  *Id*. at 125-129.

Urgent neurology and MRI requests were placed on November 7, 2002.  They were approved by Utilization Management that same day.  The MRI showed an abnormal lumber spine and abnormal enhancement and changes.  There was significant tissue enhancement displacing the nerve root, but no abscess collection.  This is consistent with a diagnosis of Pott's disease*Id*. at 130-134.

On November 20, 2002, plaintiff was approved and scheduled for a corpectomy fusion to stabilize his back with rods and screws due to severe degenerative changes. Plaintiff was admitted to the infirmary at Augusta on December 18, 2002, and discharged on January 6, 2003, following a successful surgery. *Id*. at 136-139.

In response to the defendants' motion, the plaintiff has submitted nothing of substance to adequately rebut the defendants showing that he was provided with constitutionally adequate medical care. Significantly, plaintiff has failed to submit any medical evidence to supports his contention that his treatments and medications fell below applicable medical standards and constitutionally adequate standards of care. He simply disagrees with the defendants treatment for his Pott's Disease.

In the court's view, plaintiff WHITE has failed to establish the defendants' deliberate indifference to his medical needs, serious or otherwise. The record is replete with indications that treatment has been afforded the plaintiff on numerous occasions. Therefore, the defendants are entitled to summary judgment.

Accordingly, IT IS RECOMMENDED that the defendants' MOTION FOR SUMMARY JUDGMENT (Tab #120) be **GRANTED**. Pursuant to 28 U.S.C. §636(b)(1), the parties may serve and file written objections to this **RECOMMENDATION** with the district judge to whom this case is assigned, **WITHIN TEN (10) DAYS** after being served with a copy thereof.

SO ORDERED, this 1st day of JULY, 2005.

CLAUDE W. HICKS, JR.
UNITED STATES MAGISTRATE JUDGE

11